IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 12, 2023

## STATE OF TENNESSEE v. DENNY KENTRA REYNOLDS

**Appeal from the Circuit Court for Maury County**
**No. 2018-CR-26999      Stella L. Hargrove, Judge**

_____

### No. M2022-01212-CCA-R3-CD
_____

A Maury County Circuit Court jury convicted the defendant, Denny Kentra Reynolds, of possession of 26 grams or more of cocaine with the intent to sell, possession of one-half ounce to 10 pounds of marijuana with the intent to sell, and possession of drug paraphernalia.  The trial court imposed an effective 12-year sentence.  On appeal, the defendant challenges the sufficiency of the evidence supporting his convictions, the trial court's denial of his motion to suppress, and the length of his sentence.  Upon review, we affirm.

**Tenn. R. App. P. 3; Judgments of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which KYLE A. HIXSON and MATTHEW J. WILSON, JJ., joined.

William C. Barnes, Columbia, Tennessee, for the appellant, Denny Kentra Reynolds.

Jonathan Skrmetti, Attorney General and Reporter; Richard D. Douglas, Senior Assistant Attorney General; Brent A. Cooper, District Attorney General; and Jonathan Davis, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

On May 11, 2018, officers responded to a shooting that occurred outside a residence in Maury County, Tennessee, and conducted a warrantless "protective sweep" of the residence and a shed located behind the residence.  Upon entering the shed, an officer smelled the odor of marijuana and observed digital scales, and he subsequently obtained a search warrant for the shed.  As the result of evidence seized during the execution of the search warrant, the Maury County Grand Jury returned an indictment charging the

defendant with possession with intent to sell 26 grams or more of cocaine within 1,000 feet of a park, possession with intent to sell between one-half ounce and 10 pounds of marijuana within 1,000 feet of a park, and possession of drug paraphernalia. Prior to trial, the State announced that it was not pursuing the allegations that the offenses occurred within 1,000 feet of a park. The trial commenced on May 19, 2021.

Investigator Neylan Barber with the VICE and narcotics division of the Columbia Police Department ("CPD") testified that on May 11, 2018, at approximately 12:30 p.m., he obtained a search warrant for a shed located behind a residence in Columbia, Tennessee. He and other officers executed the search warrant approximately 20 minutes later. Investigator Barber stated that "Patrice" Reynolds, the defendant's mother, owned the residence and the shed and that Ms. Reynolds informed him that the defendant had been living in the shed. Investigator Barber said that it was "obvious" that someone had been living in the shed. Inside the shed was a futon that had been converted into a bed, which was not "made." Articles of men's clothing were lying around the shed "indicative of somebody taking them off and leaving them there." Ms. Reynolds identified a cell phone that was plugged into a charger as belonging to the defendant. Investigator Barber observed photographs of the defendant with others inside the shed, as well as mail and medical bills listing the defendant at a different address. Investigator Barber stated that "we knew that [the defendant] had just left the shed" prior to the officers' arrival.

Investigator Barber testified that during the execution of the search warrant, officers seized a package containing approximately 52 grams of a white powder that he believed to be cocaine, a package containing approximately 14 grams of a white powder that he believed to be cocaine, a jar containing approximately 55 grams of what he believed to be marijuana, digital scales, small jewelry bags, sandwich bags, a marijuana grinder, marijuana "roaches," two cell phones, ammunition for a 12 gauge shotgun, 10 millimeter shell casings, and a "mag filler that would be consistent with a Glock." Investigator Barber stated that upon entering the shed, he observed marijuana "stems" and digital scales in plain view. He stated that a typical marijuana user purchases one to five grams of marijuana in one transaction and smokes one-half to one gram of marijuana in a single cigarette. He stated that a typical cocaine user generally purchases "a few tenths" of a gram or "points" of powder cocaine in a single transaction and uses "[m]aybe a point or a couple of points" of powder cocaine in a single session.

During cross-examination, Investigator Barber testified that he did not ask the defendant whether he lived in the shed because the defendant was hospitalized at the time of the search. Investigator Barber stated that Ms. Reynolds initially said the shed was used for those who smoked cigarettes because she did not allow smoking inside the residence, and she gave officers consent to search the shed. Once officers realized that the defendant's property was inside the shed, Investigator Barber questioned Ms. Reynolds,

who stated that the defendant was living in the shed. She did not tell Investigator Barber that anyone else was living in the shed. Investigator Barber acknowledged seeing multiple prescriptions for Abby Johnson in the shed.

During redirect examination, Investigator Barber testified that he knew that the defendant had been in the shed within 10 minutes of the initial responding officers' arrival at the scene. Investigator Barber did not know how long the contraband had been inside the shed.

Special Agent Lela Jackson, a forensic scientist with the Tennessee Bureau of Investigation ("TBI"), was accepted by the trial court as an expert in forensic chemistry. She testified that she tested the packages of substances recovered by officers during the search of the shed. One package contained 49.48 grams of cocaine, a Schedule II controlled substance; a second package contained 12.53 grams of cocaine; and the third package contained 55.6 grams of marijuana, a Schedule VI controlled substance.

The State rested. After a *Momon* colloquy, the defendant elected not to testify, but he called his mother, Beatrice Reynolds, as a witness.

Ms. Reynolds testified that she rented the residence, which was owned by Ken Keyser, that her three other adult sons lived with her, and that other relatives previously had lived in the residence with her. Ms. Reynolds stated that the shed had been used as a rap studio for her sons and their friends, as a "general hangout area," and as a place where her sons, relatives, and other visitors could smoke cigarettes since she did not allow smoking inside the residence. She said that her sons and other relatives, such as Abby Johnson, who is married to Ms. Reynolds' nephew, occasionally slept in the shed. Ms. Reynolds testified that when officers asked her who lived in the shed, she replied that the shed was not a "one-person area, everybody is there" and that she "couldn't just say who just really just stayed in there." She acknowledged that she told officers that the defendant stayed in the shed "on occasion." She had no knowledge of any illegal substances in the shed or to whom they belonged.

The State recalled Investigator Barber in rebuttal. He testified that when he searched the shed, he found no evidence that the shed was being used as a "hangout area" by multiple people or as a music studio. He estimated that the shed was 10 feet by 12 feet, and he observed a full-sized futon that was folded out into a bed, a "full dresser," and a shelf inside the shed. He stated that he and other officers found it difficult to walk in the shed during the search due to the limited space and that he did not believe that the shed would be a comfortable area for several people to gather. Investigator Barber stated that he found no evidence that someone other than the defendant had been living in the shed.

- 3 -

At the close of the proof, the jury convicted the defendant of possession of 26 grams or more of cocaine with the intent to sell, possession of one-half ounce to 10 pounds of marijuana with the intent to sell, and possession of drug paraphernalia.

The sentencing hearing was held on June 21, 2022. The trial court stated that the sentencing hearing was delayed for almost one year because the defendant absconded following the trial. He was later apprehended by a bail bondsman at the same address where the offenses occurred.

The State entered the defendant's presentence report as an exhibit and presented the testimony of the probation officer who prepared the report. According to the presentence report, the defendant had seven prior felony convictions, including a felony theft conviction, a felony marijuana conviction, retaliation for past action conviction, two convictions of reckless endangerment with a deadly weapon, and two convictions of reckless aggravated assault. He also had 13 prior misdemeanor convictions, including convictions of driving on a revoked license, driving on a suspended license, drug possession, resisting arrest, and evading arrest. His terms of probation had been revoked on two prior occasions as the result of his arrests for new charges. The defendant acknowledged that he had smoked marijuana for most of his life and had used cocaine on a few occasions. He stated that the only occasion during which he had been "clean" for six months or more was in 2003. According to the presentence report, which was dated July 2, 2021, the defendant acknowledged that he last used marijuana and cocaine during the weekend of May 29, 2021, which was after he was convicted of the instant offenses. According to the risk and needs assessment, the defendant fell within the "high violent" category of risk to reoffend.

The defendant offered an allocution during which he requested that the trial court impose the minimum sentence. He also maintained that he missed his previously scheduled sentencing hearing because he was hospitalized.

The trial court stated that in determining the defendant's sentence, the court considered the evidence presented at trial and during the sentencing hearing, the presentence report, the general principles of sentencing, the nature and characteristics of the defendant's criminal conduct, mitigating and enhancement factors, statistical information as to sentencing practices for similar offenses in Tennessee, the defendant's allocution, and his potential for rehabilitation and treatment. The court declined to consider the results of the Risk and Needs Assessment against the defendant, finding that the assessment "is not a useful tool for sentencing."

The trial court applied enhancement factor (1), "[t]he defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary

- 4 -

to establish the appropriate range[.]" T.C.A. § 40-35-114(1). The court noted that the defendant had 20 prior criminal convictions, including seven prior felony convictions, and the court gave the enhancement factor "great weight." The court also applied enhancement factor (8), "[t]he defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community," placing "considerable weight" on the enhancement factor. *Id.* § 40-35-114(8). The court noted that the defendant had been sentenced to probation on multiple occasions and that his probation had been revoked twice after he was arrested on new charges. The court declined the defendant's request to apply mitigating factor (11), "[t]he defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct[.]" *Id.* § 40-35-113(11).

The parties agreed that the defendant qualified as a Range I, standard offender for the cocaine conviction and as a Range II, multiple offender for the marijuana conviction. The court recognized that because the defendant was convicted of possession of 26 grams or more of cocaine with the intent to sell, he was not eligible for probation. *See id.* §§ 39-17-417(i)(5); 40-35-303(a). The court sentenced the defendant to 12 years as a Range I, standard offender for the cocaine conviction, four years as a Range II, multiple offender for the marijuana conviction, and 11 months and 29 days for the conviction for possession of drug paraphernalia. Although the court found that the defendant qualified for consecutive sentences because he was "an offender whose record of criminal activity is extensive," the court declined to impose consecutive sentences. *Id.* § 40-35-115(b)(2). Rather, the court ordered the defendant to serve his sentences concurrently, resulting in an effective 12-year sentence of incarceration.

Following a timely but unsuccessful motion for new trial, the defendant filed a timely notice of appeal. On appeal, the defendant asserts that the evidence is insufficient to support his convictions, that the trial court erred in denying his motion to suppress because the officers' initial warrantless protective sweep of the shed was unconstitutional, and that the trial court imposed an excessive sentence.

*I. Sufficiency of the Evidence*

The defendant challenges the sufficiency of the evidence supporting his convictions, asserting that the proof did not establish that he possessed the drugs and drug paraphernalia found in the shed. The State responds that the evidence is sufficient to support the convictions. We agree with the State.

Sufficient evidence exists to support a conviction if, after considering the evidence—both direct and circumstantial—in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a

reasonable doubt. Tenn. R. App. P. 13(c); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). This court will neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Dorantes*, 331 S.W.3d at 379. The verdict of the jury resolves any questions concerning the credibility of the witnesses, the weight and value of the evidence, and the factual issues raised by the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

"It is an offense for a defendant to knowingly . . . [p]ossess a controlled substance with intent to . . . sell the controlled substance." T.C.A. § 39-17-417(a)(4). Possession of 26 grams of more of any substance containing cocaine with the intent to sell is a Class B felony. *Id.* § 39-17-417(i)(5). Possession of not less than one-half ounce and not more than 10 pounds of marijuana with intent to sell is a Class E felony. *Id.* § 39-17-417(g)(1). Furthermore, it is an offense for a defendant "to possess with intent to use[] drug paraphernalia to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance or controlled substance analogue." *Id.* § 39-17-425(a)(1).

The term "possession" embraces both actual and constructive possession. *State v. Cooper*, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). For a person to "constructively possess" a drug, that person must have "the power and intention at a given time to exercise dominion and control over . . . [the drug] either directly or through others." *Id.* (quoting *State v. Williams*, 623 S.W.2d 121, 125 (Tenn. Crim. App. 1981)). Additionally, "it may be inferred from the amount of a controlled substance or substances possessed by an offender, along with other relevant facts surrounding the arrest, that the controlled substance or substances were possessed with the purpose of selling or otherwise dispensing." T.C.A. § 39-17-419.

Investigator Barber testified that he was aware that the defendant had been in the shed within 10 minutes of the initial responding officers' arrival at the scene. We recognize that the mere presence of a person in an area where drugs are discovered is not, alone, sufficient to support a finding that the person possessed the drugs. *See State v. Bigsby*, 40 S.W.3d 87, 90 (Tenn. Crim. App. 2000). However, the evidence taken in the light most favorable to the State established that the defendant had been living in the estimated 10 foot by 12 foot, one-room shed where officers recovered drug paraphernalia and large amounts of drugs, including marijuana and digital scales that were in the officers' plain view upon entering the shed. Investigator Barber noted that inside the shed was a futon that had been converted into a bed and was not "made," that men's clothing was lying

around the shed "indicative of somebody taking them off and leaving them there," that Ms. Reynolds identified a cell phone that was plugged into a charger inside the shed as belonging to the defendant, and that Investigator Barber located photographs of the defendant with others and the defendant's mail and medical bills inside the shed.

The defendant relies on the discovery of prescription medication in another person's name and Ms. Reynolds' testimony that multiple people had stayed in the shed and used it as a gathering area and music studio to support his claim that the evidence was insufficient to establish that he lived in the shed or otherwise possessed the drugs and paraphernalia found in the shed. However, Investigator Barber testified that the space inside the shed was limited due to its small size and the amount of furniture, that he and other officers found it difficult to walk around inside the shed due to the limited space, and that he did not believe the shed would have been a comfortable area for several people to gather. Investigator Barber also testified that he found no evidence that the shed was being used as a "hangout area" by multiple people or as a music studio or that someone other than the defendant had been living in the shed. Through its verdict, the jury credited Investigator Barber's testimony over Ms. Reynolds' testimony, and we will not disturb this credibility determination on appeal. *See Cabbage*, 571 S.W.2d at 835.

We conclude that when viewed in the light most favorable to the State, the evidence established that the defendant possessed the drugs and drug paraphernalia located in the shed, that the amount of cocaine exceeded 26 grams, that the amount of marijuana was more than one-half ounce but less than 10 pounds, and that the quantity of drugs far exceeded those typically possessed for personal use. Accordingly, we conclude that the evidence is sufficient to support the defendant's convictions.

## II. Denial of Suppression Motion

The defendant maintains that the trial court erred in denying his motion to suppress evidence seized from the shed. He asserts that the officers' initial warrantless protective sweep of the shed was not supported by exigent circumstances and that the officers exceeded the scope of the protective sweep. The State responds that the protective sweep was proper to ensure the safety of the officers and others at the scene and that the officers properly relied upon evidence observed in plain view during the protective sweep to obtain a search warrant for the shed.

Prior to trial on July 21, 2020, the defendant filed a motion to suppress, alleging that "no probable cause existed for a search or search warrant." The State filed a response asserting that upon responding to the scene of a reported shooting, officers conducted a warrantless "protective sweep" to "ensure the scene was clear of any individuals who could have posed a threat to the safety of the officers" and that the

protective sweep was supported by exigent circumstances and did not exceed the bounds authorized by the exigency.

A suppression hearing was held on August 4, 2020, during which the State presented Investigator Barber as the lone witness. Investigator Barber testified that he responded to a report of a shooting at the address. He stated that when he arrived, people were pointing and saying that they believed the shooting occurred at the rear of the residence. He learned that the defendant was injured and had been transported to a hospital emergency room, and officers were dispatched to the hospital to speak to the defendant. Officers located shell casings near the roadway approximately 20 to 30 yards from the residence. Investigator Barber stated that the shed was located in the back left corner of the property, was within "a few feet" of the back of the house, and was "[m]aybe 40 yards" from the roadway.

Investigator Barber testified that he "[i]mmediately" decided to conduct a "protective sweep," explaining:

> we're getting conflicting information. We know we've got one victim at the E.R. Not sure of his status. We're not sure if we have more victims. We know that they're confirming that call that came in, that there was a shooting. . . . We obviously have found shell casings leading us to believe there definitely has been a shooting, plus the victim at the E.R.

Investigator Barber stated that the purpose of the protective sweep was "[p]reservation of life." At the time of the protective sweep, he did not have any information regarding the number or identity of the shooters or whether they were still on the property, and he had not received any information from the officers who were dispatched to the hospital to speak to the defendant.

The officers began by conducting a protective sweep of the house and then by working their way to the back of the property. Investigator Barber stated that because they were searching for the shooters or any victims, the officers only searched areas where a person could hide. He testified that upon entering the shed, he immediately smelled the odor of marijuana and saw a set of digital scales "in plain sight." The officers exited the shed once they determined that no one was inside.

Investigator Barber testified that at some point, Ms. Reynolds, who he believed to be the owner of the residence, arrived, spoke to detectives, and consented to a search of the house and the shed. Ms. Reynolds told officers that the shed was used as a gathering area for those who smoked cigarettes. Investigator Barber stated that once he

and other officers entered the shed to conduct a search based on Ms. Reynolds' consent, he observed "men's items" and photographs depicting the defendant with whom Investigator Barber was familiar. Investigator Barber instructed officers to leave the shed, and he sought "clarification" from Ms. Reynolds, who confirmed that the defendant had been living in the shed. Investigator Barber obtained and executed a search warrant for the shed.

At the conclusion of the suppression hearing, the trial court made oral findings denying the defendant's motion to suppress. The trial court found that exigent circumstances justified the protective sweep.

On April 21, 2021, the defendant filed an amended motion to suppress, asserting that the protective sweep of the shed was not supported by probable cause or exigent circumstances. The defendant argued that the protective sweep was too far removed from the time and location of the shooting and that the search warrant, which was based upon information observed by the officers during the protective sweep, failed to otherwise establish probable cause.

During the May 3, 2021 suppression hearing, Investigator Barber testified that a call reporting the shooting was received at approximately 9:10 a.m. on May 11, 2018, and that he arrived at the scene "within a few minutes." Patrol officers were the first to arrive at the scene. Investigator Barber learned that shell casings were "in the middle of the street," that an injured victim was at the hospital, and that the shooting was tied to the residence. He stated that the information regarding the shooting was "evolving" and that the officers did not know the identity of the shooter or shooters or whether they remained at the scene. He noted that multiple officers and bystanders were at the scene and that before conducting an investigation, the officers decided to conduct a protective sweep for the safety of the officers and others at the scene. Investigator Barber stated that the protective sweep occurred "within 30 minutes from the call coming out" and within 15 minutes of his arrival at the scene. He agreed that the protective sweep was completed "within a matter of minutes."

Investigator Barber testified that he subsequently spoke to Ms. Reynolds and informed her that he smelled marijuana while inside the shed. Ms. Reynolds stated that the shed was a "common area where everybody smokes and hangs out," and she consented to a search of the shed. Investigator Barber reentered the shed and said that within "just a few minutes," he observed items such as men's clothing and photographs of the defendant that did not belong to Ms. Reynolds. He stopped the search and questioned Ms. Reynolds, who acknowledged that the defendant lived in the shed. The officers locked the shed, and Investigator Barber began preparing a search warrant. He stated that he was able to prepare the search warrant and have it signed by a judge within one to one and one-half hours.

During cross-examination, Investigator Barber agreed that he arrived at the scene between 9:10 and 9:15 a.m. Other officers had arrived at the scene prior to Investigator Barber and spoke to the bystanders. Investigator Barber stated that the shell casings were "in front of the residence just west of the corner of the residence in the street." He said that although the shell casings were in the street and away from the shed, "[i]t's a pretty confined area" and that officers did not know where the shooting originated. He stated that witnesses reported that the shooting occurred at the residence and that officers determined that the victim was the defendant, "who we know to live at that residence." Investigator Barber said the protective sweep began within 10 to 20 minutes of his arrival at the scene and that he determined that a search warrant was necessary within 30 to 45 minutes.

The search warrant for the shed, which was entered as an exhibit, was signed by a magistrate on May 11, 2018 at 12:30 p.m. The transcript of the suppression hearing reflects that the affidavit supporting the search warrant was provided to the trial court, but the affidavit was not entered as an exhibit during the suppression hearing but was entered as an exhibit at trial. The affidavit, which was prepared by Investigator Barber, provided:

> Your affiant made contact with the residence . . . after dispatch reported that one male who was later identified as [the defendant] was shot. Upon arriving on the scene, officers did immediately locate evidence of a shooting and began to secure the area for a crime scene. As officers were at the residence, it was determined that [the defendant] had already been taken to the hospital, but was a resident . . . where the shooting occurred. Due to the need to secure the scene, your affiant and other officers conducted a protective sweep of the residence and a brown shed located behind the residence. The shed was more specifically located behind the residence on the south/east corner. Upon entering the shed to conduct a protective sweep, your affiant could immediately smell the odor of marijuana. Also in plain view inside the shed, your affiant visually identified a pair of digital scales that are commonly used when selling illegal narcotics. Your affiant was able to identify the smell of marijuana based on his training and experience. While inside the shed, I did observe pictures in plain view of a male that I know to be [the defendant]. Upon later speaking with Beatrice Reynolds[,] she did clarify that her son ([the defendant]) stays in the shed, and does smoke marijuana. Your affiant is aware that [the defendant] has a history of selling illegal narcotics.

The affidavit set forth Investigator Barber's training and experience and his knowledge regarding the practices of drug dealers.

At the conclusion of the suppression hearing, the trial court made oral findings denying the defendant's amended motion. The trial court found that the protective sweep was "reasonable and valid" due to concerns for the safety of the officers and the public and that the timing of the protective sweep was "reasonable."

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000); *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, questions of credibility, the weight and value of the evidence, and the resolution of conflicting evidence are matters entrusted to the trial judge, and this court must uphold a trial court's findings of fact unless the evidence in the record preponderates against them. *Odom*, 928 S.W.2d at 23; *see also* Tenn. R. App. P. 13(d). The application of the law to the facts, however, is reviewed de novo on appeal. *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998).

Both the state and federal constitutions offer protection from unreasonable searches and seizures; the general rule is that a warrantless search or seizure is presumed unreasonable and any evidence discovered is subject to suppression. *See* U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."); Tenn. Const. art. I, § 7 ("That the people shall be secure in their persons, houses, papers and possessions, from unreasonable searches and seizures . . . ."). "[T]he most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment-subject only to a few specifically established and well delineated exceptions.'" *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971) (alteration in original) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)); *see also State v. Bridges*, 963 S.W.2d 487, 490 (Tenn. 1997). "The exceptions are 'jealously and carefully drawn,' and there must be 'a showing by those who seek exemption . . . that the exigencies of the situation made that course imperative.'" *Coolidge*, 403 U.S. at 455 (quoting *Jones v. United States*, 357 U.S. 493, 499 (1958), and *McDonald v. United States*, 335 U.S. 451, 456 (1948)). "We are not dealing with formalities. The presence of a search warrant serves a high function." *McDonald*, 335 U.S. at 455. Thus, a trial court necessarily indulges the presumption that a warrantless search or seizure is unreasonable, and the burden is on the State to demonstrate that one of the exceptions to the warrant requirement applied at the time of the search or seizure. *See, e.g.*, *Missouri v. McNeely*, 569 U.S. 141, 148 (2013) ("Our cases have held that a warrantless search of the person is reasonable only if it falls within a recognized exception."). The generally recognized exceptions to the Fourth Amendment warrant requirement include "search incident to arrest, plain view, stop and frisk, hot pursuit, search under exigent circumstances, and . . . consent to search." *State v. Cox*, 171 S.W.3d 174, 179 (Tenn. 2005) (citations omitted).

The defendant asserts that the officers' warrantless protective sweep of the shed during which Investigator Barber smelled marijuana and observed digital scales in plain view was unconstitutional and that, therefore, Investigator Barber's observations while inside the shed cannot be considered in determining probable cause for the issuance of the search warrant. The defendant does not claim that if the protective sweep was constitutional, the information in the search warrant, which included Investigator Barber's detecting the odor of marijuana inside the shed, did not otherwise fail to establish probable cause. The defendant also does not challenge the officers' warrantless reentry into the shed based on Ms. Reynolds' consent. Regardless, we conclude that the officers' warrantless protective sweep of the shed was supported by probable cause and exigent circumstances.

"Given the importance of the warrant requirement in safeguarding against unreasonable searches and seizures, a circumstance will be sufficiently exigent only where the State has shown that the search is imperative." *State v. Meeks*, 262 S.W.3d 710, 723 (Tenn. 2008) (citing *Coolidge*, 403 U.S. at 454-44; *State v. Hayes*, 188 S.W.3d 505, 514 (Tenn. 2006); *State v. Yeargan*, 958 S.W.2d 626, 641 (Tenn. 1997) (Reid, J., concurring)). Our supreme court has provided the following non-exclusive list of "frequently-arising situations that have been found to be sufficiently exigent" to justify the warrantless search of a residence: "(1) hot-pursuit, (2) to thwart escape, (3) to prevent the imminent destruction of evidence, (4) in response to an immediate risk of serious harm to the police officers or others, and (5) to render emergency aid to an injured person or to protect a person from imminent injury." *Meeks*, 262 S.W.3d at 723 (citing *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006); *Olson*, 495 U.S. at 100; *United States v. Huffman*, 461 F.3d 777, 782 (6th Cir. 2006); *State v. Adams*, 238 S.W.3d 313, 321 (Tenn. Crim. App. 2005)). Said differently, "[e]xigent circumstances are those in which the urgent need for immediate action becomes too compelling to impose upon governmental actors the attendant delay that accompanies obtaining a warrant." *Meeks*, 262 S.W.3d at 723.

"To determine whether a law enforcement officer faced an emergency that justified acting without a warrant, this Court looks to the totality of the circumstances." *McNeely*, 569 U.S. at 149 (citing *Brigham City, Utah*, 547 U.S. at 406; *Illinois v. McArthur*, 531 U.S. 326, 331 (2001); *Richards v. Wisconsin*, 520 U.S. 385, 391-96 (1997); *Cupp v. Murphy*, 412 U.S. 291, 296 (1973)). The Supreme Court explained:

> We apply this "finely tuned approach" to Fourth Amendment reasonableness in this context because the police action at issue lacks "the traditional justification that . . . a warrant . . . provides." *Atwatere v. Lago Vista*, 532 U.S. 318, 347 n.16 (2001). Absent that established justification, "the fact-specific nature of the reasonableness inquiry," *Ohio v. Robinette*, 519 U.S. 33, 39 (1996), demands that we evaluate

each case of alleged exigency based "on its own facts and circumstances." *Go-Bart Importing Co. v. United States*, 282 U.S. 344, 357 (1931).

*McNeely*, 569 U.S. at 150. This analysis focuses on the information known to the officer at the time of the search and any reasonable inferences that may be drawn therefrom. *Meeks*, 262 S.W.3d at 723-24. "Where the asserted ground of exigency is risk to the safety of the officers or others, the governmental actors must have an objectively reasonable basis for concluding that there is an immediate need to act to protect themselves and others from serious harm." *Id.* at 724. "The manner and scope of the search must be reasonably attuned to the exigent circumstances that justified the warrantless search, or the search will exceed the bounds authorized by exigency alone." *Id.* "In addition to the existence of an exigent circumstance, the search generally must also be supported by probable cause." *Id.* at 726 n. 31 (citing *Kirk v. Louisiana*, 536 U.S. 635, 637 (2002); *United States v. McClain*, 444 F.3d 556, 562 (6th Cir. 2005); *R.D.S. v. State*, 245 S.W.3d 356, 366 n.4 (Tenn. 2008); *State v. Henning*, 975 S.W.2d 290, 300 (Tenn. 1998)).

We conclude that based on the totality of the circumstances, the officers had probable cause to believe that a shooting had occurred on the premises and an "objectively reasonable basis" for concluding that there was an immediate need to conduct a protective sweep of the residence and the shed. *Meeks*, 262 S.W.3d at 724. The officers arrived at the scene shortly after receiving a report of a shooting. Investigator Barber testified that shell casings were in the roadway near the residence, that witnesses reported that the shooting occurred at the residence, and that some witnesses reported that the shooting occurred at the back of the residence. Investigator Barber was aware that one victim, the defendant, was being treated at a hospital and stated that the defendant was someone "who we knew to live at that residence." Investigator Barber was unaware of whether any other victims were involved or whether any shooters remained at the scene. As a result, he decided to conduct a protective sweep of the residence and the shed to ensure that no other gunshot victims were present and to ensure that there were no shooters who were hidden and could pose a threat to the officers who were investigating the case and the bystanders who remained at the scene.

The defendant challenges the protective sweep of the shed as unreasonable, asserting that the protective sweep occurred too long after the shooting occurred and that the shed was located too far away from the shooting. However, the protective sweep occurred within 30 minutes of the officers' receiving the report of the shooting and within 10 to 20 minutes of Investigator Barber's arrival. Investigator Barber testified that although shell casings were in the roadway in front of the residence, officers were unaware at the time where the shooting originated and that witnesses reported that the shooting occurred at the residence or at the rear of the residence. Even if the shooting occurred in

the roadway in front of the residence, Investigator Barber estimated that the shed was located approximately 40 yards from the roadway, a distance that was not so unreasonable as to preclude the possibility that a shooter may have been hiding inside the shed. Based upon the information known by the officers at the time, the officers would have been derelict in their duty had they failed to enter and secure the shed. Investigator Barber testified that the officers only searched areas in which they believed a person could have been hidden.

We conclude that the protective sweep of the shed was supported by probable cause and exigent circumstances and that the manner and scope of the protective sweep was "reasonably attuned to the exigent circumstances that justified the warrantless search." *Meeks*, 262 S.W.3d at 724. Once Investigator Barber entered the shed, he detected the odor of marijuana, saw a set of digital scales in plain view, and properly relied upon his observations in obtaining a search warrant. The trial court properly denied the defendant's motion to suppress.

## III. Sentencing

The defendant contends that the trial court imposed an excessive sentence. He does not assert that the trial court erroneously applied the enhancement factors or failed to apply any specific mitigating factors. Rather, he asserts that his 12-year sentence is excessive in light of "the sentencing statutes and guildeline[s]," "the facts of the case," and his "record." He maintains that the trial court should have imposed the minimum 8-year sentence. The State responds that the trial court did not err in imposing a sentence within the applicable range. We agree with the State.

Our supreme court has adopted an abuse of discretion standard of review for sentencing and has prescribed "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The application of the purposes and principles of sentencing involves a consideration of "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant…in determining the sentence alternative or length of a term to be imposed." T.C.A. § 40-35-103(5). Trial courts are "required under the 2005 amendments to 'place on the record, either orally or in writing, what enhancement or mitigating factors were consider, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing.'" *Bise*, 380 S.W.3d 698-99 (quoting T.C.A. § 40-35-210(e)). Under the holding in *Bise*, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709. The same standard of review also applies to a trial court's decision regarding "probation or any other alternative sentence." *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012).

The defendant was subject to a sentencing range of 8 to 12 years as a Range I offender for possession of 26 grams or more of any substance containing cocaine with the intent to sell, a Class B felony. *See* T.C.A. §§ 39-17-417(i)(5); 40-35-112(a)(2). He was subject to a sentencing range of two to four years as a Range II offender for possession of not less than one-half ounce and not more than 10 pounds of marijuana with intent to sell, a Class E felony. *See id.* §§ 39-17-417(g)(1); 40-35-112(b)(5). He was subject to a sentence of 11 months and 29 days for possession of drug paraphernalia, a Class A misdemeanor. *See id.* §§ 39-17-425(a)(1)-(2); 40-35-111(e)(1).

The record reflects that the trial court imposed the maximum sentence in the applicable range for each conviction after articulating its reasons in accordance with the purposes and principles of sentencing, considering the presence and absence of enhancement and mitigating factors, and weighing those factors. The trial court applied enhancement factor (1), "[t]he defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range," finding that the defendant had 20 prior criminal convictions, including seven prior felony convictions. *Id.* § 40-35-114(1). The trial court also applied enhancement factor (8), "[t]he defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community," noting that the defendant had been sentenced to probation on multiple prior occasions and that his probations had been revoked twice as a result of his arrest on new charges. The record supports the trial court's findings. The trial court also found that the defendant qualified for consecutive sentences as an "offender whose record of criminal activity is extensive," *id.* § 40-35-115(b)(2), but the trial court declined to impose consecutive sentences upon considering the principles of sentencing.

The trial court properly applied two enhancement factors, found that no mitigating factors were applicable, weighed the enhancement factors, and considered all the relevant principles associated with sentencing when imposing the sentences. We conclude that the trial court did not abuse its discretion by imposing the within-range sentences.

For the foregoing reasons, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE

- 15 -